## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **WOODSTREAM CORPORATION,**<br><br>**Plaintiff,**<br><br>**v.**<br><br>**LISA P. JACKSON, Administrator, United States Environmental Protection Agency, and**<br>**UNITED STATES ENVIRONMENTAL PROTECTION AGENCY,**<br><br>**Defendants.** | **Civil Action No. 11-cv-0867 (BJR)**<br><br>**ORDER AND MEMORANDUM OPINION ON MOTION FOR SUMMARY JUDGMENT** |

This case concerns the extent to which the Environmental Protection Agency may place conditions on registrations for rodenticide products under the Federal Insecticide, Fungicide, and Rodenticide Act, and whether certain particular conditions were arbitrary and capricious. Plaintiff is Woodstream Corporation (hereinafter "Woodstream"), a manufacturer of rodenticide; defendants are Lisa P. Jackson, in her capacity as Administrator for the United States Environmental Protection Agency (hereinafter "EPA" or "the EPA"), and the EPA itself.[1]

This case was reassigned from Judge Boasberg on January 27, 2012. Before the court at this time is plaintiff's Motion for Summary Judgment [dkt. #11] (hereinafter "*Pltf.'s Mot.*") and defendants' Motion for Judgment on the Pleadings or, in the Alternative, for Summary Judgment [dkt. #13] (hereinafter "*Def.'s Mot.*"). Although styled in the alternative as a motion for judgment on the pleadings pursuant to Rule 12(c) of the Federal Rules of Civil Procedure, EPA's motion plainly turns on the consideration of materials outside the scope of the pleadings, and

---

[1] As defendant Jackson is sued in her capacity as Administrator of the EPA, defendants shall throughout be referred to as "EPA" or "the EPA."

both parties effectively treat the motion as one for summary judgment.  Accordingly, the court treats the motion as one for summary judgment.  *See Ebling v. U.S. Dep't of Justice*, 796 F. Supp. 2d 52, 55 (D.D.C. 2011).

## I.     LEGAL STANDARD

The parties have cross-moved for summary judgment under Federal Rule of Civil Procedure 56, which provides for entry of summary judgment if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  The facts in this case are undisputed, and the key issues are questions of law, so summary judgment is appropriate.

## II.     STATUTORY BACKGROUND

### A.     Registration Provisions

The Federal Insecticide, Fungicide, and Rodenticide Act (FIFRA), 7 U.S.C. §§ 136-136y, requires all pesticide products distributed or sold in the United States to be registered with the EPA. 7 U.S.C. § 136a(a).  The EPA is directed to approve the registration of a pesticide if, *inter alia*, "(A) its composition is such as to warrant the proposed claims for it; (B) its labeling and other material required to be submitted comply with the requirements of this subchapter; (C) it will perform its intended function without unreasonable adverse effects on the environment; and (D) when used in accordance with widespread and commonly recognized practice it will not generally cause unreasonable adverse effects on the environment." 7 U.S.C. § 136a(c)(5).  "A FIFRA registration is a product-specific license describing the terms and conditions under which the product can be legally distributed, sold, and used." *Reckitt Benckiser, Inc. v. EPA*, 613 F.3d 1131, 1133 (D.C. Cir. 2010).

In 1978, FIFRA was amended to add Section 3(c)(7), which allows for registration of products under special circumstances.  Subsections (A) and (C) of Section 3(c)(7) were drawn from the Senate version of the bill, S. 1678. H.R. Rep. No. 95-1560 at 34.  The purpose of the amendment was to address the backlog that existed in the registration process. S. Rep. No. 95-334 at 3.  One of the "serious impediment[s]" identified in the registration program at that time was "EPA's inability to issue registrations on a conditional basis." *Id.* at 4.  In particular, there existed a "double standard" between producers with older registrations and those seeking new registrations.  As the EPA requirements for new registrants grew more stringent, new registrants could find themselves held to higher standards than producers who held older registrations, even if their respective products were nearly identical. *Id.*  The "unforeseen and undesirable twists to the law would be eliminated" by giving the EPA "authority to conditionally register pesticides." *Id.*

> **B.      Administrative Review**

The procedure for administrative review is set forth under Section 6 of FIFRA. 7 U.S.C. § 136d.  "A pesticide product remains registered until EPA or the registrant cancels it pursuant to Section 6." *Woodstream Corp. v. Jackson*, Case No. 11-cv-867, 2011 U.S. Dist. LEXIS 151994, at *3-4 (D.D.C. June 3, 2011) (citation omitted).  EPA may commence cancellation proceedings if it appears that a pesticide does not comply with the provisions of FIFRA, or that it generally causes unreasonable adverse effects on the environment. 7 U.S.C. § 136d(b).  EPA may issue a notice of intent either to cancel the registration or to hold a hearing to determine whether the registration should be canceled. *Id.*  If EPA chooses the first option, the registrant may demand a hearing. 7 U.S.C. §§ 136d(b), (d); 40 C.F.R. § 164.20.

Cancellations of *conditioned* registrations fall under Section 6(e).  While a hearing may be requested, it has a slightly narrower scope than a hearing under Section 6(b).  The only matters for resolution at a Section 6(e) hearing are whether the registrant has satisfied the condition (or initiated and pursued the appropriate action to comply with the condition) within the time provided, and whether EPA's determination with respect to the disposition of existing stock is consistent with the subchapter. 7 U.S.C. § 136d(e)(2).  Existing stocks of a pesticide canceled under Section 6(e) may continue to be sold for as long as EPA specifies, as long as it will not have unreasonable adverse effects on the environment. 7 U.S.C. § 136d(e)(1)(B).

## III.   FACTUAL BACKGROUND[2]

### A.   RMD for Rodenticides

On May 28, 2008, the EPA issued a Risk Mitigation Decision for Ten Rodenticides ("RMD"), which imposed "risk mitigation measures" for products containing certain rodenticides, including bromethalin and difenacoum.  The RMD set June 4, 2011 as the "Last Day for 'Release of Shipment' of Product Not Complying with Risk Mitigation Decision," and stated that products released for shipment after that date which were not in compliance with the RMD "would be considered mislabeled."  The RMD further stated that "should a registrant fail to implement any of the risk mitigation measures identified in this document," the EPA "may take regulatory action to address the risk concerns from the use of the affected products," which may include "cancellation actions." *Plaintiff's Statement of Undisputed Material Facts* (hereinafter "Pltf.'s SOF") ¶¶ 9-11.

---

[2] The facts below are compiled from the parties' statements of undisputed material facts.  While each party submitted a statement of undisputed material facts, neither party controverted the facts in the other's submission; therefore, the facts asserted in the statements are deemed conceded.  *See* LCvR 7(h).

The RMD required each affected registrant to submit a letter within ninety days stating whether the registrant would agree to voluntarily cancel or amend its product registrations to comply with the risk mitigation measures set forth in the RMD. Pltf.'s SOF ¶ 13.

### B.      Initial Registrations

Woodstream manufactures and distributes certain rodenticide products under the VICTOR® brand name that are registered with the EPA pursuant to FIFRA. Pltf.'s SOF ¶ 1. Five products produced by Woodstream are at issue in this case.

Two products containing the rodenticide bromethalin were registered in July 2006 and April 2007 respectively. Woodstream's bromethalin products were conditionally registered by EPA pursuant to FIFRA Section 3(c)(7)(A), on the condition that Woodstream submit certain test data within fifteen months of registration.  There were no other conditions.  Woodstream timely submitted the test data to fulfill the condition. *Id.* ¶¶ 3-5.

Three products containing the rodenticide difenacoum were registered between September 2007 and June 2008. Pltf.'s SOF ¶ 3.  Woodstream's difenacoum products were conditionally registered by EPA pursuant to FIFRA Section 3(c)(7)(C), with two conditions: Woodstream was required to submit certain test data within fifteen months of registration, which it did, and Woodstream was required to "comply with EPA's final Rodenticide Risk Mitigation" decision "for similar rodenticides . . . on the same time schedule as those similar rodenticides." *Id.* ¶ 6.

On August 29, 2008, Woodstream submitted a letter to EPA indicating that it did not intend to voluntarily comply with the requirements of the RMD. Pltf.'s SOF ¶ 14.

### C.      Woodstream's Amendments to Registrations

On July 8, 2008, Woodstream filed an application to amend its registrations for the five products by including additional package sizes and net contents.  In a letter dated November 19, 2008, EPA approved the amendments, subject to the following condition:

> This registration is not consistent with the Agency's May 28, 2008, "Risk Mitigation Decision for Ten Rodenticides."  EPA anticipates cancellation of those existing products that are not consistent with the Risk Mitigation Decision to occur no later than June 4, 2011. In the meantime, EPA is approving new registrations and amendments to existing registrations of rodenticide bait products, on a time limited basis, so long as the registrations do not present greater risks of unreasonable adverse effects than existing products.  Accordingly, this registration is approved only subject to the condition that the registration shall expire on June 4, 2011. This condition of registration may be amended in conjunction with amendments to conform to the Risk Mitigation Decision.  Absent such amendments, product release for shipment by the registrant after June 4, 2011 would be in violation of FIFRA.

Pltf.'s SOF ¶¶ 16-17; *Complaint* [dkt. #1], Exh. 3 at 2.

On February 17, 2009, Woodstream applied for additional amendments to its difenacoum registrations to create three sub-labels for consumer use, agricultural building use, and professional use.  In a letter dated May 28, 2009, EPA approved the amendments subject to the above conditions. *Complaint*, Exh. 4 at 2. [3]

**D.     Procedural History**

On February 18, 2011, and April 28, 2011, Woodstream wrote letters to the EPA requesting that its registrations be amended to remove the June 4, 2011 expiration dates imposed under the November 19, 2008 and May 28, 2009 letters.  EPA did not formally respond to either letter, and took no action to remove the June 4, 2011 expiration date. Pltf.'s SOF ¶ 25-28.

---

[3] On May 27, 2011, EPA removed the conditions as applicable to the difenacoum products labeled for agricultural building use and professional use, as those products do not violate the risk mitigation measures of the RMD. Pltf.'s SOF ¶¶ 18-20.

On May 9, 2011, Woodstream filed this suit, seeking declaratory and injunctive relief prohibiting EPA from enforcing the conditions on its registrations. Pltf.'s SOF ¶ 29.  On the same day, Woodstream filed a Motion for Preliminary Injunction [dkt. #3].  On June 3, 2011, Judge Boasberg denied Woodstream's request for a preliminary injunction, having determined that Woodstream failed to carry its burden on the four preliminary injunction factors, including likelihood of success on the merits. *Woodstream*, 2011 U.S. Dist. LEXIS 151994, at *28.

## IV.  DISCUSSION

### A.    The matter is not moot

EPA argues that, because the expiration date upon which the registrations were conditioned has passed, the issue is now moot and the court lacks subject matter jurisdiction. *Def.'s Mot.* at 1-2.  EPA claims that the registrations "no longer exist" because the June 4, 2011 expiration date passed.  Woodstream argues that EPA's interpretation of the mootness doctrine would curtail judicial review of federal agency actions dramatically.

"Under Article III of the Constitution," a court "may only adjudicate actual, ongoing controversies." *Honig v. Doe*, 484 U.S. 305, 317 (1988).  "[A] case is moot when the issues presented are no longer 'live' or the parties lack a legally cognizable interest in the outcome." *Powell v. McCormack*, 395 U.S. 486, 496 (1969).  However, if a court has the power to effectuate a partial remedy for a plaintiff, even if a full and satisfactory remedy is unavailable, a case is not moot. *Church of Scientology v. United States*, 506 U.S. 9, 13 (1992).

This court agrees with plaintiff that the matter before it is not moot.  The cases cited by defendants for the proposition that a case may be moot because a period or deadline has passed are not applicable here.  *See, e.g.*, *Fund for Animals, Inc. v. U.S. Bureau of Lang Mgmt.*, 460 F.3d 13, 18 (D.C. Cir. 2006) (plaintiff challenged policies in a memorandum which had expired,

so the claim was moot).  At issue in this case is the right to impose an expiration date itself, and

whether EPA may terminate a registration through the imposition of an expiration date condition.

The event that defendants contend renders the action moot is the very agency action challenged

in the lawsuit.[4]

### B.    The EPA may place conditions on registrations unrelated to test data

Woodstream argues that the conditions placed on its registrations are *ultra vires*, because,

as Woodstream reads the plain language of FIFRA Section 3(c)(7), EPA is authorized to

condition the approval of a registration or amended registration only on the subsequent

submission of test data that are required for that registration—nothing more.  *Pltf.'s Mot.* at 14-

15.  Woodstream claims that Congress clearly intended to limit EPA's authority, and that to read

any "open-ended additional exceptions to the general requirement for unconditional registration

under FIFRA § 3(c)(5) would violate the basic tenet of statutory construction, *expressio unius est*

*exclusion alterius* ("the explicit mention of one is the exclusion of the other")." *Id.* at 17.  The

court disagrees.

EPA argues that plaintiff's reading of the statute is incorrect, and that it has the authority

to place conditions on pesticide registrations other than those specified in Section 3(c)(7), *i.e.*,

test data.  According to EPA, plaintiff is reading into the statute an exclusivity clause that is not

there.  Rather, EPA points out that FIFRA is silent as to whether EPA may or may not place

conditions on registrations other than conditions specified in Section 3(c)(7).  EPA has

interpreted its registration authority to "establish, on a case-by-case basis, other conditions

---

[4] Furthermore, contrary to EPA's claims, plaintiff has available remedies.  If the court were to determine that EPA may not place conditions on registrations unrelated to test data, and that the registrations containing conditions other than test data requirements were not valid, Woodstream would still have partial remedy available.  Woodstream's initial registrations for its two bromethalin products had conditions related only to the submission of test data.  If the amendments had not been granted, those initial registrations would continue until EPA initiated cancellation proceedings under Section 6(b). *See Reckitt Benckiser*, 613 F.3d at 1134.  Therefore, at least some partial remedy is available.

applicable to registrations to be issued under FIFRA sec. 3(c)(7)." 40 C.F.R. § 152.115. Given

that the statute is silent, EPA argues, its interpretation of FIFRA as allowing EPA to include

conditions in pesticide registrations other than those specified in Section 3(c)(7) must prevail

because is reasonable and consistent with the purposes of FIFRA. *Def.'s Mot.* at 17-26.

Defendant is correct.

When reviewing an agency's interpretation of a law it administers, the court must apply

the principles of *Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837

(1984). Under *Chevron*, the first step begins with the statute. The court must examine the

statute to determine whether Congress has spoken directly to the precise question at issue.

*Natural Res. Def. Council v. Envtl. Prot. Agency*, 643 F.3d 311, 322 (D.C. Cir. 2011). If it has,

that is the end of the analysis, "for the court, as well as the agency, must give effect to the

unambiguously expressed intent of Congress." *Chevron*, 467 U.S. at 842-43. On the other hand,

if the statute is "silent or ambiguous with respect to the specific issue," then the court must

determine whether the agency's response to the question at issue is based on a permissible

construction of the statute. *Id.* at 843. The court must use "the traditional tools of statutory

interpretation—text, structure, purpose, and legislative history" to determine whether Congress

has spoken to the precise question at issue. *Consumer Elecs. Ass'n v. Fed. Commc'ns Comm'n*,

347 F.3d 291, 297 (D.C. Cir. 2003) (quoting *Pharm. Research & Mfs. of Am. v. Thompson*, 251

F.3d 219, 224 (D.C. Cir. 2001)).

As noted by Judge Boasberg in his opinion on the preliminary injunction, there is no

dispute that, under Section 3(c)(7), FIFRA explicitly allows for a conditional registration when

test data is unavailable. *Woodstream*, 2011 U.S. Dist. LEXIS, at *12-13. The statute is silent,

however, as to whether other conditions may be placed on a registration.

9

The plain language of the statute does not restrict EPA's authority as to the type of conditions that may be placed on registrations. It merely requires that, as with all registrations, the product not have "unreasonable adverse effects on the environment." 7 U.S.C. § 136(a)(c)(7). While the submission of test data is the only condition mentioned explicitly, the language does not expressly bar other language. Furthermore, the D.C. Circuit has held that the *expressio unius* canon "has little force in the context of challenges to an agency's interpretation of a statute, where we defer to an agency's interpretation unless Congress has directly spoken to the precise question at issue." *St. Marks Place Hous. Co. v. U.S. Dep't of Hous. & Urban Dev.*, 610 F.3d 75, 82-83 (D.C. Cir. 2010) (internal citation omitted).

The purpose of FIFRA, together with the statute's legislative history, further undermines Woodstream's argument. As both parties note, Section 3(c)(7) was adopted by Congress to address the inequity created by the then-existing statutory scheme between existing registrants and new applicants. While Woodstream highlights the use of the word "data" in the Senate Report pertaining to the 1978 FIFRA Amendments, the overall approach in the legislative history shows that Congress was concerned with the "lack of middle ground" in the registration process between totally denying registration and granting it—that middle ground being conditional registration. S. Rep. No. 95-334 at 4. The Senate Report to the 1978 FIFRA Amendments also states that, while the EPA must review pesticide applications to avoid any unreasonable adverse effect on the environment, "[a]n overriding concern of FIFRA is that pesticides should be available to meet pest control needs." S. Rep. No. 95-334 at 3. In short, "[s]ince registration is critical, this program must be made to work." *Id.* There is nothing to suggest that Congress intended to limit conditions on registrations to test data.

The second step of *Chevron* acknowledges the necessity of an agency being able to formulate policy and make rules to "fill any gap left, implicitly or explicitly, by Congress." *Chevron*, 467 U.S. at 843 (citation omitted). The court must determine whether the agency's interpretation of the statute is reasonable. If the legislative delegation to an agency is implicit, as it is in this case, "a court may not substitute its own construction of a statutory provision for a reasonable interpretation made by the administrator of an agency." *Id*. at 844.

The agency's view governs if it is a reasonable interpretation of the statute—"not necessarily the only possible interpretation, nor even the interpretation deemed *most* reasonable by the courts." *Entergy Corp. v. Riverkeeper, Inc.*, 129 S. Ct. 1498, 1505 (2009) (emphasis in original). EPA argues that crafting registration conditions rather than simply denying an application gives the agency the flexibility it needs to balance risks and benefits of a product, thus maximizing the availability of pesticides to the public while being consistent with FIFRA's prohibition on unreasonable adverse effects. Reading FIFRA in a way that would preclude EPA from placing conditions on registration beyond test data would eliminate that flexibility.

Woodstream's argument that it is unreasonable for EPA to impose any conditions other than those concerned with test data suffers not only in light of FIFRA's legislative history, as discussed above, but in light of other conditions routinely imposed by EPA beyond those at issue in this case. EPA routinely places a variety of conditions on registrations. Judge Boasberg noted that three of the registrations in question had additional conditions requiring registrants to submit amended labels, and observed, "Surely FIFRA does not prevent EPA from requiring such a ministerial condition be satisfied for registration." *Woodstream*, 2011 U.S. Dist. LEXIS, at *16. Were the court to read FIFRA as Woodstream suggests, EPA would be forced to deny many

regulations that could otherwise be registered with simple conditions.  Such a needlessly restrictive approach would work only to stymie the registration process.

Furthermore, as EPA notes, there is persuasive precedent recognizing agency authority to issue licenses or registrations subject to conditions.  In *Connecticut Fund for the Environment, Inc. v. EPA*, the court stated that "[c]onditional approval offers administrative agencies a measured course that may be more precisely tailored to particular circumstances than the all-or-nothing choice of outright approval or disapproval." *Connecticut Fund for the Env't, Inc. v. EPA*, 672 F.2d 998, 1006 (2d Cir. 1982).  In *McManus v. Civil Aeronautics Board*, the Second Circuit again noted that an agency's power to condition approval is "necessary for flexible administrative action and is inherent in the power to approve or disapprove," and that to hold otherwise would be "sacrificing substance to form." *McManus v. Civil Aeronautics Bd.*, 286 F.2d 414, 419 (2d Cir. 1961).

Given EPA's history of placing conditions on registration, together with case law illustrating that placing conditions on registrations and licenses is a frequent and important adjunct to an agency's power to grant registrations and licenses at all, it is clear that EPA has the authority to impose conditions other than test data requirements when granting registrations or amendments to registrations.

### C.     The conditions are not arbitrary or capricious

Woodstream argues that, even if EPA may place conditions on registrations that do not concern test data, the conditions at issue are arbitrary and capricious, and amount to an abuse of the EPA's discretion.

Under the Administrative Procedure Act (APA), a reviewing court shall "hold unlawful and set aside agency action, findings, and conclusions found to be arbitrary, capricious, an abuse

of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A), (C).  "The scope of review under the 'arbitrary and capricious' standard is narrow and a court is not to substitute its judgment for that of the agency." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

The conditions imposed by EPA on Woodstream's products set forth essentially three requirements:  (1) Woodstream must bring its products into line with the requirements of the 2008 RMD; (2) Woodstream must comply with the requirements of the RMD by June 4, 2011 (in the case of the earlier difenacoum registrations, "on the same time schedule" as similar products—*i.e.*, by June 4, 2011); (3) if Woodstream does not bring its products into line with the requirements of the RMD by June 4, 2011, it will lose the registrations upon which the conditions are placed.  Woodstream makes a barrage of arguments as to why EPA's conditions on its registrations are arbitrary and capricious.

First, Woodstream claims that EPA abused its discretion by conditioning its registrations on complying with the RMD or facing the expiration of its registrations on June 4, 2011, because the conditions allow EPA to "bypass" the cancellation procedures under Section 6, "without affording Woodstream the important procedural protections . . . provided by FIFRA § 6(b)." *Pltf.'s Mot.* at 25.  However, what Woodstream fails to recognize it that there were other avenues available to it by which it may have received an administrative hearing.  For example, Woodstream could have accepted the conditions, but immediately filed a new request for an amended registration removing the conditions.  If the EPA denied the request, as it presumably would, Woodstream would be entitled to the same remedies available under Section 6 in the case of a cancellation, including an opportunity for a full administrative hearing. 7 U.S.C. § 136a(6).

As to the difenacoum registrations that issued prior to the RMD, Woodstream argues that it was arbitrary and capricious to require compliance with the RMD eight months prior to its final publication. *Pltf.'s Mot.* at 25. The court will address Woodstream's objections to this condition, although the amendments to the difenacoum registrations would seem to render this issue no longer germane. Woodstream argues that, as the RMD did not yet exist, EPA could determine that the products would have an adverse environmental effect at some indefinite point in the future, at which point Woodstream would lose its registration without the benefit of a Section 6(b) cancellation proceeding. *Pltf.'s Mot.* at 26. This argument is without merit. The requirement to comply with the forthcoming risk management decision did not emerge from thin air. As EPA notes, the RMD was far from purely speculative at the time Woodstream's first difenacoum registration was issued in September 2007. EPA was under a remand order, and had already published a Proposed Risk Mitigation decision for public comment in January 2007. *Def.'s Mot.* at 32. Once the RMD was issued, Woodstream had three full years to comply with the conditions, which gave ample time for Woodstream either to change its product or contest the conditions.

Woodstream next argues that the placement of conditions on its amended registrations in 2008 and 2009 "was wholly dependent on the happenstance of Woodstream's application for an amendment to the Registrations," making EPA's placement of the conditions "inherently opportunistic and not even-handed." *Pltf.'s Mot.* at 27. Woodstream claims that it could not decline to amend its registrations, because it needed those amendments to remain competitive in the marketplace. *Id*. The fact that Woodstream, in the case of the bromethalin registrations, was forced to make a business choice between accepting amended registrations with conditions and

retaining unconditioned registrations does not render EPA's use of the conditions unlawful or arbitrary. *See Woodstream*, 2011 U.S. Dist. LEXIS 151994, at *18.

Woodstream also claims that the application of the conditions to its registrations placed it in a disadvantageous position in relation to earlier registrants of similar products who did not apply for amendment, and who were not subject to the conditions. Woodstream alleges that it is arbitrary and capricious for EPA to create "winners and losers" amongst "similarly situated" registrants through the imposition of the conditions on its registrations. *Id.*

Woodstream's argument is based on a false equivalence. Woodstream was not similarly situated to those earlier registrants who were targeted by the RMD, whose registrations must be cancelled through Section 6(b) cancellation procedures. The registrations subject to the conditions related to the RMD were new registrations that issued when the RMD was near its final publication and registrations that issued or were amended after its publication. EPA has placed similar conditions on registrations by other producers who applied for new registrations or for amendments to registrations during the same time period. *Def.'s Mot.* at 35. Woodstream is situated similarly to those producers, and was treated similarly.[5]

Woodstream also objects that the June 4, 2011 deadline for compliance with the RMD was unreasonable. Pursuant to its statutory mandate, EPA balanced the potential for

---

[5] Woodstream's argument arises from a its claim that this case is like another recent case in this district court, *Reckitt Benckiser, Inc. v. Jackson*, 762 F. Supp. 2d 34 (D.D.C. 2011). Contrary to Woodstream's claim, the circumstances of that case are entirely distinguishable. Reckitt Benckiser, Inc. (hereinafter "Reckitt") had an existing, unconditioned registration. EPA notified Reckitt that, following the expiration date, Reckitt's registration would be subject to a misbranding procedure rather than Section 6 cancellation. Misbranding actions lack the opportunity for hearing and due process provided in Section 6 cancellation proceedings. On March 5, 2009, Reckitt filed suit against the EPA seeking declaratory and injunctive relief preventing EPA from initiating misbranding or other enforcement action against Reckitt's rodenticide products for violation of the RMD until the cancellation procedures of FIFRA Section 6 had been initiated and completed. *Reckitt Benckiser*, 762 F. Supp. 2d at 39-40. On January 28, 2011, the district court granted summary judgment in favor of Reckitt, holding that "Congress clearly did not intend to give EPA the authority it asserted in the RMD to bring a misbranding action in lieu of a cancellation proceeding against a product that failed to comply with the RMD." *Reckitt Benckiser*, 762 F. Supp. 2d at 43.

unreasonable adverse effects on the environment with the impact of refusing registration and/or amendments to registrations for a number of rodenticides, which could impact consumer pest control needs.  Had EPA not granted the conditional registrations and amended registrations on Woodstream's products, its only other option would have been to deny those registrations outright.  It selected a deadline that was far enough in the future for producers to distribute and sell existing products, but not so far that unreasonable adverse effects on the environment would result. *Def.'s Mot.* at 34.  EPA's condition allowed Woodstream three unrestricted years in a market it would not have been able to enter otherwise, while Woodstream could also use that time to come into compliance with the RMD.  EPA's decision is entitled to deference, and was not arbitrary or capricious. *Mead*, 537 U.S. at 227-31.

> **NOW, THEREFORE,** for the reasons stated herein, it is, hereby,

> **ORDERED** that *Plaintiff's Motion for Summary Judgment* is DENIED.  It is further, hereby,

> **ORDERED** that EPA's *Motion for Summary Judgment* is DENIED as to mootness. Finally, it is, hereby,

> **ORDERED** that EPA's *Motion for Summary Judgment* is GRANTED as to the remainder of the motion.

> **SO ORDERED.**

February 28, 2012

BARBARA J. ROTHSTEIN
UNITED STATES DISTRICT JUDGE